**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Ashley Olivia, et al.,** | ) | **CASE NO. 1:19 CV 1701** |
| | ) | |
| **Plaintiffs,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **Airbus Americas, Inc., et al.,** | ) | |
| | ) | **Memorandum of Opinion and Order** |
| **Defendants.** | ) | |

### INTRODUCTION

This matter is before the Court upon (1) plaintiff Ashley Olivia's (hereinafter "plaintiff") Motion for Partial Summary Judgment (Doc. 71); (2) defendant Spirit Airlines, Inc.'s Motion for Summary Judgment (Doc. 72); and (3) Spirit Airlines, Inc.'s Motion to Exclude the Testimony of Plaintiff's Proffered Expert Witness, Anthony Micale (Doc. 73).  This action arises from injuries plaintiff Ashley Olivia sustained while an airline passenger.  For the reasons that follow, defendant's Motion to Exclude is GRANTED IN PART and DENIED IN PART.  In addition, the Court DENIES defendant's Motion for Summary Judgment and GRANTS IN PART and DENIES IN PART plaintiff's Motion for Partial Summary Judgment.

1

## FACTS

Plaintiff filed her first amended complaint naming Spirit Airlines, Spirit Airlines, Inc., Airbus Americas, Inc. ("AAI"); Airbus; Lufthansa Technik Puerto Rico, LLC ("Lufthansa PR"); Lufthansa Technik; Lufthansa Technik, AG; Lufthansa Group; HAECO Americas; HAECO Group; Hong Kong Aircraft Engineering Company, Ltd.; Hong Kong Aircraft Engineering Company America, Ltd.; and Jason Sheppard as defendants.  On June 26, 2019, plaintiff filed a second amended complaint ("Complaint"), adding Brice Manufacturing Company, Inc. ("Brice") as a defendant.  Thereafter, on July 25, 2019, AAI removed this matter to federal court on the basis of diversity jurisdiction.

The Complaint contains five claims for relief.  However, Count One, a claim for negligence, is the only claim which remains pending against moving defendant Spirit Airlines, Inc. ("Spirit Airlines").[1]

Written documentary evidence submitted to the Court establishes the following. [2]

Spirit Airlines owns an Airbus A320 aircraft ("the plane") with the Federal Aviation Administration ("FAA") registration number N607NK.  Spirit Airlines did not manufacture or design the seats on the plane.  Each of the plane's seats has two legs, both of which fit into a seat track in the plane's floor.  Each leg is attached to the seat track at two points, at the front and the

---

[1]    By Memorandum of Opinion and Order, this Court dismissed Jason Sheppard, AAI, Lufthansa PR, Brice, and HAECO Americas from this action.  The only defendants remaining in this action besides Spirit Airlines are either not recognized legal entities or parties which have not been served.

[2]    Plaintiff objects to defendant's use disclosure statements from non-parties Brice and Lufthansa PR in support of its motion for summary judgment.  The Court did not consider either of these exhibits in reaching its decision.

back.  The back attachment, or lug, is locked into the seat track.  The front attachment/lug is not locked into the seat track and sits within the seat track's groove.  The seat track has a protective cover over it.

In February 2017, Spirit Airlines sent the plane to Lufthansa PR, an FAA-certified repair station, for scheduled maintenance and a cabin reconfiguration.  The scope of this work included the installation of an additional passenger compartment seat and a "detailed inspection of seat to floor attachment and general visual inspection of seats."  This inspection included ensuring that the "seat attach fittings and the retainers are correctly installed" and "the seat tracks, the attach fittings, and the retainers are in the correct condition and have no corrosion."  Lufthansa PR's technicians certified that this work was completed and that the plane was ready to be returned to service.

Donald Pierce, Spirit Airline's manager of aircraft maintenance in Las Vegas, testified that Spirit Airline's technicians conduct three-day and weekly checks of the airline's Airbus A320 aircraft.  These weekly checks included oil servicing, oil checks, computer system checks, general visual inspections, and "general visuals of mostly all the parts of the aircraft exterior from the ground level, as well as cabin walk-throughs."  These checks are done in accordance with the "overall maintenance package of the aircraft" set forth by Airbus.  Inspections of the seats are part of these general visual inspections.  Technicians will "visually check anything that would be outstanding, like tray tables, trim, any of those kind of items that the public would see."  However, these general visual inspections do not include any checks of the seat tracks or the attachment of the seats to the floor of the plane.

Randy Howard, a former airframe and powerplant technician with Spirit Airlines,

testified that the weekly checks of the Airbus A320 aircraft take several hours.  During these weekly checks, the seats are visually inspected for "general condition" to ensure that "nothing safety-wise is wrong with" them.  During this inspection, the seats are given a "gentle shake" to ensure they are attached to the floor.  The bolts of the seat are not checked during this inspection.

On June 26, 2017, plaintiff boarded the plane at the McCarreen Airport in Las Vegas, Nevada.  Jason Sheppard ("Sheppard") was also a passenger on the plane.  According to plaintiff's deposition testimony, Sheppard sat in the seat directly in front of her ("the subject seat").  Once the plane began taxiing down the runway, the subject seat came down onto her left foot.  Sheppard stood up so she could move her foot out from under the subject seat.  Plaintiff noticed that the subject seat was "teetering" after this accident.  The plane returned to the gate and  paramedics boarded the plane in order to provide plaintiff with medical treatment.  She was taken by ambulance to a hospital and sustained injuries to her left foot.

According to Sheppard's deposition testimony, he is six feet four inches and weighed at least 520 pounds at the time of the accident.  Upon boarding the plane, Sheppard planned to sit in a "big seat" at the front of the plane, but was unable to do so because the seat was not compatible with a seatbelt extender.  A flight attendant directed him to sit in a different seat, but did not tell him specifically which seat to sit in.  Sheppard chose the subject seat, an aisle seat in Row 10. The subject seat did not appear wobbly to him when he sat down.  Fifteen minutes after he sat down in the subject seat, he leaned back and put his leg out into the aisle.  At that moment, he heard a "pop," the subject seat leaned down to the left, and he heard plaintiff cry out in pain.

Once the plane returned to the gate, Cody Hawes, a senior technician with Spirit Airlines, boarded the plane to inspect the subject seat.  Hawes testified that the subject seat was not

4

damaged or broken.  He stated that the left front lug of the seat was "out of the track" and "sitting on top of the track."  Hawes testified that this issue was "immediately visible" upon inspection and he was able to quickly secure the subject seat.  Hawes testified that he had never seen a front lug come out of the seat track before.  He stated that it would be unsafe to fly the plane with the subject seat in this condition.  Donald Pierce averred that the plane then flew on 455 flights prior to the accident, all without any issues with the subject seat.

On June 29, 2017, the plane's Row 10 seats were removed and replaced.  This included the subject seat.  Spirit Airlines then sent the subject seat to Airpac Enterprises, Inc. ("Airpac") for inspection.  Airpac's "tear-down report" indicated that the subject seat contained no defects or damage, beyond some paint and cosmetics issues.  Airpac returned the subject seat to Spirit Airlines with an FAA airworthiness approval tag.  The subject seat is now back in use with Spirit Airlines and is operating normally.

This matter is now before the Court upon plaintiff and Spirit Airlines' Motions for Summary Judgment.  Both Motions are opposed.  In addition, defendant filed a Motion to Exclude the Testimony of Plaintiff's Proffered Expert Witness, Anthony Micale.  Plaintiff opposes this Motion.

**STANDARD OF REVIEW**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates the
> absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993).  The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

In the context of cross-motions for summary judgment, the reviewing court "must

6

evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001)(citing *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 241 (6th Cir. 1991).).  Accordingly, "if it is possible to draw inferences in either direction, then both motions for summary judgment should be denied." *Champion Foodservice, LLC v. Vista Food Exchange, Inc.*, 2016 WL 4468001 at *4 (N.D. Ohio Aug. 24, 2016)(citing *B.F. Goodrich Co.*, 245 F.3d at 592-593.).

## ANALYSIS

### I.      MOTION TO EXCLUDE

Plaintiff has introduced an expert report and testimony from Anthony Micale ("Micale") in support of her Motion for Partial Summary Judgment.  Defendant asserts that Micale's opinion does not meet the standards for the admissibility of expert testimony and should be excluded.

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 was amended in 2000 in response to *Daubert v. Merrell Dow Pharmaceuticals*

*Inc.*, 509 U.S. 579 (1993) and its progeny.  Under *Daubert,* the Supreme Court emphasized the trial court's role as a "gatekeeper" in excluding unreliable expert testimony.  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008).  In this gatekeeping role, a trial court must "strike a balance between the liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other."  *Ask Chemicals, LP v. Computer Packages, Inc.*, 593 Fed.Appx. 506, 509 (6th Cir. 2014) (quoting *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-177 (6th Cir. 2009).

The *Daubert* court set forth the following non-exhaustive list of factors for trial courts to use in assessing the reliability of scientific expert testimony: (1) whether the expert's technique or theory can or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.  *Daubert,* 509 U.S. at 593-594;  *Avery Dennison Corp. v. Four Pillars Enterprise Co.*, 45 Fed.Appx. 479, 483 (6th Cir. Sept. 3, 2002).  These *Daubert* factors may be applied by the Court even if the evidence at issue is based on "technical or other specialized knowledge."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  However, not all of these factors are applicable to every type of expert testimony.  *Id.*

"The trial judge has considerable leeway in deciding how to go about determining whether particular expert testimony is reliable."  *U.S. v. Sanders*, 59 Fed.Appx. 765, 767 (6th Cir. March 7, 2003)(internal quotations omitted).  However, the Sixth Circuit has outlined a number of "[r]ed flags that caution against certifying an expert."  *Newell Rubbermaid, Inc. v.*

8

*Raymond Corp.,* 676 F.3d 521, 527 (6th Cir.2012)(*citing Best,* 563 F.3d at177).  These include "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity."  *Id.*  In addition, if an expert's testimony was prepared solely for litigation, this may also be grounds for exclusion.  *Id.*

However, the trial court's role as a "gatekeeper" under *Daubert* "is not intended to serve as a replacement for the adversary system."  *Burgett v. Troy-Bilt, LLC*, 579 Fed.Appx. 372, 376 (6th Cir. 2014).  *See also Good v. BioLife Plasma Services*, LP, 834 Fed.Appx 188, 198 (6th Cir. 2020) ("But rejection of expert testimony is the exception, rather than the rule.")(internal quotations omitted)  While an expert's testimony should be excluded when it is "mere guess or speculation," challenges to the factual basis of an expert's opinion generally go to the "weight of the evidence rather than its admissibility."  *United States v. L.E. Cooke, Co.*, 991 F.2d 336, 342 (6th Cir. 1993).  Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 595.

Finally, the proponent of the expert bears the burden of demonstrating that the expert's testimony satisfies *Daubert* by a preponderance of proof.  *Nelson v. Tennessee Gas Pipeline Co*, 243 F.3d 244, 251 (6th Cir. 2001).

Here, plaintiff has proffered the opinion testimony of Micale in the form of his expert report wherein he concludes:

- The seat did not fail.  This is supported by the fact that no damage was noted to the seat, the mounting lugs, or the seat track;

- The seat did not separate from the seat track due to the weight of the seat occupant.  This is supported by the fact that the seat and track assembly must undergo qualification testing as described above to

verify the integrity of the seat in an emergency landing condition;

- The occupant of the seat could not have caused the separation of the seat from the seat track by any normal or non-crash condition.  This is supported by analysis of forces on the seat as compared to the qualification requirements as dictated by FAR 25.561.  This is also supported by the fact that no damage was noted on the seat, the mounting system, or the seat track;

- Spirit airlines did not have a concern about the passenger weight in seat 10D.  This opinion is supported by the observed actions of Spirit airlines personnel.  Spirit has not limited the weight of the passengers.  Spirit allowed the heavy individual to continue his flight in another identical type of seat;

- The crush injury to Ashley Olivia's left small toe was caused by the luggage bar after the seat had deflected due to improper installation.  This is supported by the fact that Ashley is 5 feet 5 and a half inches tall and her foot would not likely be positioned near the front left seat lug that separated from the seat track.  This is also supported by the fact that the injury was to her left foot and the separated seat lug was near her right foot;

- The seat was never installed properly.  This opinion is supported by the fact that the seat installation process is lengthy, routine, and prone to complacency.  This complacency can and did result in human error with the seat installation;

- The seat mounts are not periodically inspected after initial installation.  This opinion is supported by the fact that the checks performed on the aircraft seating did not specifically verify the integrity of the seat mounting.  None of the three people working for Spirit Airlines that were deposed indicated that there was a specific periodic check of the seat mounting.  This can be seen in the deposition of Donald Pierce (Pg 27-29);

- The seat once loaded heavily by the occupant elastically deformed.  With the front left leg never having been installed the deformation allowed the seat to flex downward and crush Ashley Olivia's left toe.  Since all deformation was elastic the seat once unloaded returned to its original geometric shape and is likely in service today;

- The seat had never been installed correctly and once placed under a higher than usual load due to a heavy passenger is the reason the seat

10

> flexed and crushed a portion of Ashley Olivia's foot.  Spirit Airlines
> did not perform inspections of the seat mountings which allowed the
> improperly installed seat to be in service and fly in an unsafe condition.
> The seat installation violated the seat requirements as dictated by the
> FAA under Part 25 and as specified in TSO-C127a and SAE
> International Aerospace Standard AS8049.

Defendant challenges both Micale's qualifications and the reliability of his opinions.  The Court

will address each argument in turn.

### A.    Qualifications

Defendant first asserts that Micale does not have the requisite expertise with respect to

commercial airline seats and, therefore, he is unqualified to provide expert testimony "regarding

the airliner's seat and/or Spirit's maintenance practices regarding the seat."  Defendant rests this

argument on the following: (1) Micale does not hold an aeronautical engineering degree; (2) he

has never been an Airframe and Powerplant ("A&P") mechanic certified by the FAA and does

not hold an FAA-authorized Inspection Authorization ("IA"); (3) he has no commercial airline

experience; (4) this is the first case in which Micale has ever offered any expert witness opinions

regarding an aircraft seat; and (5) he has never personally installed a Brice B3100 seat.

In response, plaintiff notes that Micale has a Bachelors of Science in Mechanical

Engineering and is a member of the Society of Aerospace Engineers.  Plaintiff further argues that

during Micale's time with McDonnell Douglas, he was in charge of all "incidents and accidents"

involving the MD-80 Aircraft and worked closely with the National Transportation Safety Board

in this role.  Plaintiff asserts that Micale has examined numerous airline seats during the course

of his career and has been retained as an expert in 250 cases.

Upon review, the Court finds that Micale is qualified to testify regarding aircraft seat

installation, maintenance, and failure.  Neither *Daubert* or Rule 702 impose a rigid set of

11

credentials an expert must possess in order to be qualified as a witness.  Rather, Rule 702

provides that an expert may be qualified by virtue of "knowledge, skill, experience, training, or

education."  Fed. R. Evid. 702.  Here, although Micale is not licensed as an FAA mechanic, he

has worked in the field of aviation for over 35 years and served as the engineering lead for the

"commercial airliner accident and incident resolution team" at the McDonnell Douglas Aircraft

Company.  Perhaps most relevant, he was involved with seat design and "corrective actions on

seats" at McDonnell Douglas.  During his deposition, Micale explained that the subject seat's

seat track is "essentially the same" as the seats which he primarily dealt with during his tenure at

McDonnell Douglas.  While he may not have installed the exact same airline seat in the exact

same aircraft that plaintiff had sustained injuries on, the Count is willing to accept that based

upon his experience in aviation safety and seat design, Micale is qualified to offer his opinion.

*See Dilts v. United Group Services*, 500 Fed.Appx. 440, 445 (6th Cir. 2012)("Such a lack of

familiarity affects the witness' credibility, and not his qualifications to testify.")(internal

quotations and citations omitted)  Accordingly, Micale is sufficiently qualified under the

requirements of Rule 702.

      **B.**      **Reliability**

Defendant also challenges the reliability of Micale's opinions.  Specifically, defendant

argues that several components of Micale's opinion lack technical and evidentiary support, as

required by both Rule 702 and *Daubert*.  The Court will address each of these components

separately.

      *1.*      *Rearward Force*

First, defendant argues that Micale's opinion that Sheppard could not have  generated

sufficient rearward loading force to overload the seat is without foundation or support.

12

Defendant asserts that Micale's testimony and report are "wholly devoid of a 'free body force analysis' or any other analysis of Sheppard's forces."  Defendant notes that Micale did not conduct any testing to determine if Sheppard could exert enough rearward force to overload the subject seat and did not base his opinion on any third-party studies, peer review articles, or publications.

Plaintiff maintains that Micale is not required to conduct his own independent testing or cite peer reviewed articles.  Plaintiff asserts that Micale's analysis was "grounded instead upon the information and observations that had been documented by the airline's own technicians, in addition to elementary principles of mechanical engineering."  Plaintiff notes that the principle of gravity supports Micale's conclusion and dispels the "far-fetched notion that the front lug just popped out when Sheppard adjusted himself in the seat."

Upon review, the Court finds that Micale's conclusion regarding the rearward force exerted by Sheppard satisfies the basic requirements of *Daubert* and Rule 702.  As noted above, Micale opined that Sheppard did not cause "the separation of the seat from the seat track by any normal or non-crash condition."  Within his report, he set forth the information upon which he relied to reach this conclusion, which included an "analysis of forces on the seat as compared to the qualification requirements as dictated by FAR 25.561."

The Federal Aviation Regulations ("FARs") are promulgated by the FAA.  FAR §25.561 sets forth the required design strength of commercial airline seats.  Relevant to here, a seat must be designed to withstand 1.5 gs of rearward force.

In his report, Micale concluded that Sheppard could not have exceeded 1.5 gs of rearward force based on a "free body force analysis."  Specifically, Micale found:

A 1.5g rearward force would be 255 pounds rearward force on the seat.

13

> This is very unlikely since the person would need to generate 255 pounds of backward force on the seat while sitting and having a row of seats in front of him.  It is unlikely that enough leverage could be generated to push back on the seat with 255 pounds of force.
>
> All of these force calculations are happening while the majority of the passenger's weight is pushing down on the seat.  The downward force would push down on the seat mount lug into the seat rail and keep it from coming out.
>
> In conclusion it is not possible for a person to exceed the load capacity of this aircraft seat.

During his deposition, Micale explained that he reached this conclusion by conducting his own calculations and "engineering judgment analysis."  He indicated that he reviewed the diagram of the seat which collapsed and found that the downward force of gravity and the geometry of the seat supported his position.  He also based his conclusion on his own experience in the aviation industry, noting that an airline seat typically would be able to withstand much more than the minimum prescribed under the FARs.  The Court is satisfied that Micale's opinion is based upon an adequate foundation of his own expertise in the aviation industry, his engineering background, the diagram of the seat, and the universally-accepted law of gravity.  This satisfies Rule 702's requirement that the expert's testimony be the product of sufficiently reliable principles and methodology.

To be sure, the Court acknowledges that Micale did not conduct any testing, provide detailed calculations in his report, or cite to any peer-reviewed articles.  However, Micale's opinion was formed by comparing the evidence before him against the expertise and knowledge he has as both a mechanical engineer and professional in the aviation industry.  This is sufficient under both *Daubert* and Rule 702.  *See Kumho Tire*, 526 U.S. at 148-49 ("Experts of all kinds tie observations to conclusions through the use of . . . 'general truths derived from . . . specialized

14

experience'.")  Further, the Federal Rules of Evidence do not require that an expert base his opinion on his own empirical testing.  Similarly, citing to peer-reviewed articles and studies is also not a prerequisite for admissibility.  *Blevins v. Kirk*, 2019 WL 5151310, *3 (6th Cir. 2019) ("[E]xpert opinions that do not necessarily lend themselves to scientific testing and peer review may otherwise be admissible, such as where the expert has extensive practical experience in a field.")

Defendant raises several arguments regarding whether or not Micale's actual calculations are correct.  Defendant certainly can challenge or test the accuracy of Micale's opinon regarding the amount of rearward force Sheppard was able to exert on the seat.  Indeed, the fact that Micale's conclusion can be tested further supports its admissibility.  *See Daubert*, 509 U.S. at 593 (factor supporting admissibility is "whether the expert's technique or theory *can* or has been tested.")(emphasis added)

Accordingly, the Court finds that Micale's testimony regarding the rearward forces on the seat satisfies the reliability requirements of both *Daubert* and Rule 702.

###### 2.      *Opinion on Installation*

Defendant next argues that Micale's conclusion that the seat was incorrectly installed is without evidentiary support.  Specifically, defendant asserts the following conclusions are without any evidentiary or technical basis: (1) that there were "holes" in the installation documentation process; (2) that the front lug of the seat could not move independently of the rear lug; (3) the "popping" sound was from the seat track cover coming off; and (4) there was a lack of damage to the subject seat.  Plaintiff generally objects to these arguments, noting that Micale is opining on a topic which "has been the focus of his professional career for the last thirty-five years."  Plaintiff also maintains that Micale's opinions are grounded "upon the information and

15

observations that had been documented by the airline's own technicians."

Upon review, the Court finds that Micale's opinion that the subject seat was installed incorrectly has a reliable basis and, therefore, is admissible.  Micale relied upon the deposition testimony of three Spirit employees, the lack of repairs to the seat after the incident, photographs of the seat, diagrams of the seat assembly, and the Spirit Work Orders to support his opinion. This evidence, combined with his ample experience in both engineering and aviation, allowed him to conclude that the subject seat was not properly installed.  Micale also discussed the "popping" sound heard by Sheppard during he incident and concluded:

> Given the circumstances leading up to the event and the design of the seat and seat track system along with the high crash load requirements placed on aircraft seats the most likely explanations [sic] for the pop is the snapping action of the plastic seat track cover while it is being dislodged from the seat track by the upward motion of the seat that had not been properly installed.  Notably the seat track cover is not seen in the photograph of the seat row.  This is likely because it had snapped out of place.  Additionally, since there was no damage to the seat track, the seat lug or the seat it is unlikely that the pop noise came from any of these components.

While defendant may disagree with the conclusions Micale has reached based upon this evidence, these purported weaknesses and inconsistencies go to weight, not admissibility.  *See In re Scrap Metal Antitrust Litigation*, 527 F.3d at 530.

Defendant focuses on the fact that Micale is not familiar with Lufthansa PR's exact seat installation and inspection process and has never personally installed or inspected the subject seat.  Defendant also points to evidence which it argues shows that the seat was installed correctly.  It is true that Micale's opinions are based upon his own mechanical engineering and aviation experience, rather than direct experience with Lufthansa PR or the subject seat. However, these factors cut against the weight to be given to his opinion and do not affect its admissibility.  *See Palatka v. Savage Arms, Inc.*, 535 Fed.Appx. 448, 455 (6th Cir. 2013)

16

(holding that a mechanical engineer's "skill, education, and training in mechanical engineering render him competent to offer opinions on a variety of mechanical topics, and we will not require [the expert] to have a specialized knowledge of firearms to offer opinions here.");  *Surles ex rel. Johnson v. Greyhound Lines, Inc*., 474 F.3d 288, 294 (6th Cir.2007) (holding that although the expert's experience was not specific to a particular industry, his background and experience left him "well-positioned to assist the trier of fact to make sense of" the evidence).

Accordingly, the Court finds that Micale's conclusion that the seat was installed incorrectly is admissible under Rule 702 and *Daubert.*

3.      *Opinion on Seat Inspections*

Finally, defendant argues that Micale's opinion that Spirit Airlines should have been conducting its own inspections of the seat mountings is inadmissible.  Defendant argues that Micale has no commercial airline experience and is not an aviation maintenance inspector. Defendant contends that Micale fails to identify any "maintenance manual provisions, any FARs, or other authorities that would require Spirit" to conduct periodic inspections of the seat mountings.  Plaintiff does not directly address this argument, beyond noting that defendant was "not free to forego proper safety inspections."

Upon review, the Court finds that Micale's conclusion regarding seat inspections is inadmissible under *Daubert* and Rule 702.  As noted above, Micale opined that "Spirit Airlines did not perform inspections of the seat mountings which allowed the improperly installed seat to be in service and fly in an unsafe condition."  His report further states that he reviewed the depositions of three Spirit Airline employees, which reflect "there is not an inspection process in place at the line level to assure that the seats are installed properly."  He also noted that because of this lack of inspection process, "only the accidental observation" would reveal that a seat was

17

incorrectly installed.  He concluded that "Spirit Airlines likely relies on the accuracy of the

initial installation to assure proper seat retention into the seat track."

During his deposition, Micale was asked to further explain this conclusion:

Q:     Okay.  And there's no regulation, Federal regulation, or any regulation
       that required Spirit Airlines to essentially double check the correct
       installation of that seat assembly once it was signed off as return to
       service by Lufthansa, they were not required by any Federal regulation
       to do that, isn't that true, sir?

A:     No, not entirely.  There's certainly detailed requirements that are in the
       Federal Aviation requirements, but there's an overreaching
       requirement, and that is to conduct safe operations, and if you have to
       institute additional checks and measures to assure the flying public are
       safe, then you as a carrier are obligated to do so.

***

A.     So to answer the question, I would say there is nothing that would stop
       them from doing whatever checks they needed to to assure that the
       flying public were safe.

Q:     I'm not asking you if there is something that would stop them.  I'm
       asking you if there's something that would require Spirit Airlines to do
       an inspection of some type to confirm that the work done and signed off
       and returned to service by Lufthansa was required to be double checked
       or inspected by Spirit.  Cite to me a Federal Aviation Regulation that
       required Spirit to do that when they got this seat back returned to
       serviced.

A:     I think I just did.  The Federal Aviation Administration, if you told
       them that they - I'm going to ignore this check because you didn't tell
       me to do it, yet I know it's going to cause somebody to get hurt or a
       plane to get crashed, I would like to see that day.  That would be an
       interesting event.

Q:     Cite to me –

A:     The FAA doesn't treat it – the NTSB and the FAA do not treat it that
       way.  Because somebody doesn't tell you to do the responsible thing
       doesn't relieve you from the responsibility of doing the right thing.  So
       I don't buy into that argument at all.

18

> Q:    I'm not giving you an argument, Mr. Micale, I've asked you a specific
>       direct question.  I want a citation to a Federal Aviation Regulation, I
>       want the chapter and number that you say exists that require Spirit
>       Airlines to do some type of work or inspection to double check the
>       work done by Lufthansa after the work was returned to service.  Give
>       me a citation, a number citation.  That's what I'm asking you, that's
>       what I'm going to ask the Judge to understand I asked you.  If you have
>       one, give it to me, I'll write it down and I'll look at it.  If you can't give
>       me a number, I'll assume you don't have one.
>
> A:    I will find – I've seen it in the FAR.  I will find the statement that says
>       do the right thing, people, despite the fact that it may not be written
>       down for you, don't go fly into a brick wall.

As an aircraft accident expert and mechanical engineer, Micale may have specialized knowledge concerning why and how the seat failed.  However, he has never worked for a commercial airline and, therefore, he cannot draw on his own experience to support his conclusion that defendant should have been conducting inspections of the seat mountings.  *See Rule 702, Advisory Committee Note* ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'")

Moreover, as these deposition excerpts illustrate, Micale has not provided any reliable support for his opinion.  Micale testified that commercial airlines have a general, overarching obligation to ensure that their aircraft are safe.  Micale then extrapolates from this obligation that commercial airlines should be conducting regular inspections of the seat mountings in their aircraft.  He provides no support for this conclusion, either through any pertinent regulations, publications discussing industry standards, or even his own experience.  *See Newell Rubbermaid, Inc.*, 676 F.3d at 527 ("Red flags that caution against certifying an expert include . . . improper

19

extrapolation.")  Accordingly, because plaintiff has not shown by a preponderance of the evidence that Micale's testimony regarding seat inspections satisfies *Daubert*, it will be excluded.

In sum, the Court finds that the majority of Micale's opinion is admissible under both *Daubert* and Rule 702.  However, the Court finds that Micale's conclusion regarding regular inspections of the seat mountings is without support and, therefore, inadmissable.  For these reasons, defendant's Motion to Exclude Micale's testimony is GRANTED IN PART and DENIED IN PART.

## II.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Choice of Law

The only claim that remains pending against defendant is a state law claim for negligence.  Before analyzing the merits of the parties' Motions for Summary Judgment, the Court notes that the parties disagree as to whether Ohio or Nevada law should govern this claim. Defendant inaccurately states that a "federal court must apply state law of the forum" and applies Ohio law.[3]  Plaintiff cites both Nevada and Ohio law in support of her Motion for Partial Summary Judgment, but argues that Nevada law should apply.  Plaintiff also notes that there is a difference between Nevada and Ohio law regarding apportionment of fault.

"A federal court exercising diversity jurisdiction applies the choice of law rules of the state in which it sits."  *Standard Fire Ins. Co. v. Ford Motor Co.,* 723 F.3d 690, 692 (6th Cir. 2013).  In Ohio, courts have adopted the two-step approach contained in the Restatement (Second) of Conflict of Laws.  *Premium Freight Management, LLC v. PM Engineered Solutions,*

---

[3]     The Court rejects defendant's suggestion that plaintiff has "forfeited" a choice of law analysis.

*Inc.,* 906 F.3d 403, 406 (6th Cir. 2018).  The first step is to determine whether there is an actual

conflict between the laws of the states involved.  *Id.* at 406-407.  If there is no conflict, it is

unnecessary to choose between the two.  *Id.* at 407 ("Only if they conflict must we proceed to

the second step to choose between them.")

      If such a conflict exists, courts will "apply the law of the state with the most significant

contacts to the dispute."  *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 230 n. 3 (6th Cir. 1997).

*See also Newberry v. Silverman*, 789 F.3d 636, 643 (6th Cir. 2015).  Factors a court considers in

making this determination include (1) the place of injury; (2) the location where the conduct

causing the injury took place; (3) the place of business of the parties; (4) the place where the

relationship between the parties is centered; and (5) any factors under section six that may be

deemed relevant to the action.  *Premium Freight Management*, 906 F.3d at 407 (citing *Morgan*

*v. Biro Mfg. Co.*, 474 N.E.2d 286, 289 (Ohio 1984)).

      As to the first step in the analysis, the Court finds that a conflict exists between the laws

of Ohio and Nevada.  The standard for negligence under Nevada and Ohio law is the same.  *See*

*Sadler v. PacifiCare of Nev.*, 130 Nev. 990, 995 (Nevada 2014)("In order to state a claim for

negligence, a plaintiff must allege that (1) the defendant owed the plaintiff a duty of care, (2) the

defendant breached that duty, (3) the breach was the legal cause of the plaintiff's injuries, and (4)

the plaintiff suffered damages.")(internal quotations omitted); *Texler v. D.O. Summers Cleaners*

*& Shirt Laundry Co.*, 693 N.E.2d 271, 280 (Ohio 1998) ("In order to establish actionable

negligence, the plaintiff must show the existence of a duty, a breach of the duty, and an injury

proximately resulting therefrom.")  Similarly, both Nevada and Ohio hold common carriers to a

heightened duty of care.  *See Obenchain v. Outdoor Promotions, LLC,* 2017 WL 2813970, *4

(Nevada 2017)("A common carrier of passengers is bound to use the utmost care and diligence

for the safety of the passengers, and is liable for any injury to a passenger occasioned by the slightest negligence against which human prudence and foresight should have guarded.")(internal quotations omitted); *Dietrich v. Community Traction Co.*, 1 Ohio St.2d 38, 41 (Ohio 1964) ("it is generally recognized that the duty of a common carrier of passengers is to exercise the highest degree of care for the safety of its passengers consistent with the practical operation of the system.")

However, there is a conflict between Ohio and Nevada law on the subject of apportionment of fault. In Ohio, a defendant may be held jointly and severally liable for all compensatory damages that represent economic loss in a tort action if the defendant was more than fifty percent at fault. O.R.C. §§ 2307.22–23. However, if a defendant is fifty percent or less at fault, they are only liable for their proportionate share of the damages. *Id.* In contrast, Nevada generally does not apply joint and several liability to negligence cases. *See* N.R.S. § 41.141(4). Instead, liability is apportioned under Nevada's comparative negligence law. *Id. See also Humphries v. Eighth Jud. Dist. Ct.*, 129 Nev. 788, 794 (Nevada 2013) ("NRS 41.141 alters joint and several liability by permitting apportionment of fault and providing for several liability amongst negligent defendants.") Accordingly, as a conflict exists between the laws of Nevada and Ohio, the Court must determine which state has the most significant contacts to the dispute.

Upon review of the relevant factors, the Court concludes that Nevada law applies to plaintiff's negligence claim against defendant. Plaintiff was injured in Nevada. While plaintiff bought her plane ticket in Ohio, she boarded the plane in Nevada. The subject seat failed while it was in Nevada. The only factor which completely weighs in favor of Ohio law is the fact that plaintiff was an Ohio resident at the time of the accident and Spirit Airlines conducts business in Ohio's airports. Given that plaintiff's injury and arguably some of the conduct giving rise to the

22

injury occurred in Nevada, the Court finds that Nevada has the most significant contacts to the dispute.  *See Malmacher v. Jesse*, 786 Fed.Appx 558, 565 (6th Cir. 2019) ("Under Ohio's rules, there is a presumption that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit.")(internal quotations omitted)

Accordingly, Nevada law governs plaintiff's negligence claim.

### B.     Negligence (Count One)

Defendant argues that it is entitled to summary judgment in its favor because plaintiff is unable to establish a *prima facie* case of negligence.  Conversely, plaintiff argues that summary judgment should be granted in her favor because the evidence establishes that defendant breached the duty of care owed to her.

In order to establish a *prima facie* case of negligence, plaintiff must show that  "(1) the defendant had a duty to exercise due care towards the plaintiff; (2) the defendant breached the duty; (3) the breach was an actual cause of the plaintiff's injury; (4) the breach was the proximate cause of the injury; and (5) the plaintiff suffered damage."  *Perez v. Las Vegas Medical Center*, 805 P.2d 589, 590–91 (Nev. 1991).

The element of duty is not in dispute.  The parties are in agreement that defendant is a common carrier and owes its passengers a heightened duty of care under state law.[4]  *See Farace v. American Airlines, Inc.,* 2012 WL 2367572, *3 (D. Nev. 2012) (finding that a heightened common carrier duty of care applied to airline whose passenger was injured).  Under Nevada law, a common carrier is "bound to use the utmost care and diligence for the safety of the passengers, and is liable for any injury to a passenger occasioned by the slightest negligence

---

[4]     *See* Doc. No. 71 at 7; Doc. No. 72-1 at 29; Doc. No. 84 at 2; Doc. No. 89 at 11.

against which human prudence and foresight should have guarded."  *Obenchain,* 2017 WL

2813970 at \*4.[5]

The parties disagree, however, as to whether or not this duty of care was breached.

Plaintiff argues that the subject seat was not installed correctly and defendant's failure to ensure

that it was installed correctly constituted a breach of duty.  Defendant disputes that the subject

seat was installed incorrectly and argues that even if it was installed incorrectly, it did not breach

the duty of care owed to plaintiff.

The Court finds that a genuine dispute remains as to whether or not the subject seat was

correctly installed.  Viewing the evidence in the light most favorable to plaintiff, the Court finds

that plaintiff has offered evidence, in the form of expert testimony, which establishes that the

subject seat was not installed correctly.  As discussed *supra*, the FAA requires that all aircraft

seats are able to withstand a certain amount of rearward force.  The expert opined that Sheppard

could not exceed this threshold simply by leaning back into the subject seat.  This opinion is

further supported by the fact that the subject seat and the lug were not damaged by the force of

Sheppard's weight.

---

[5]    The Court notes that defendant also argues that premises liability law does not
apply in this case.  (Doc. No. 72-1 at 22; Doc. No. 89 at 18)  It does not appear
that plaintiff opposes this position.  (Doc. No. 86 at 11) "Premises liability is a
theory of negligence that establishes the duty owed to a plaintiff who suffers
injury on a landowner's premises as a result of conditions on the land."  *Scott v.
Smith's Foods and Drug Centers, Inc.*, 2019 WL 7597045, \*2 (D. Nev. 2019).  A
review of Nevada case law indicates that this theory is normally used in situations
involving real property, such as a store or a restaurant.  *See, e.g.,  Sprague v.
Lucky Stores, Inc.,* 849 P.2d 320, 322 (Nev. 1993); *FGA, Inc. v. Giglio*, 128 Nev.
271, 280 (Nev. 2012).  There is no indication that the duty of care used in
premises liability also applies to common carriers under the circumstances
presented here.  Accordingly, the Court finds that premises liability principles are
not implicated in this case.

24

Conversely, defendant has offered credible evidence that the seat was installed properly. Four months prior to the accident, defendant sent the plane to Lufthansa PR, an FAA-certified repair station, to conduct scheduled maintenance. Lufthansa PR certified that it had conducted a detailed inspection of all the seat and floor attachments and ensured that all the seat tracks were correctly installed. The plane then flew on 455 flights prior to the accident, all without any issues with the subject seat.

It is undisputed that it was Lufthansa PR, not defendant, who certified that the seats on the plane were installed correctly and the plane ready to be returned to service. Plaintiff has presented no evidence that it was defendant who installed the subject seat. Accordingly, in order for plaintiff to succeed on her negligence claim, she must show that defendant somehow breached the duty owed to her, not in the installation of the seat, but in the failure to ensure that the seat was safe during her flight.[6]

The Court finds that a reasonable juror could draw inferences in either direction as to whether or not defendant breached its duty of care. Viewing the evidence in the light most favorable to plaintiff, testimony from defendant's own employees establishes that defendant should have been aware of this defect. Testimony from Hawes, the technician who inspected the subject seat following the accident, establishes that it was "immediately visible" that the front lug was out of the seat track. Testimony from both Howard and Pierce establish that defendant

---

[6]    Plaintiff argues that the "mere fact that [she] was injured in this manner is sufficient proof, without more, that this heightened duty was breached." As defendant correctly notes, a common carrier is not strictly liable for a passenger's injuries. *Young v. Circus Circus Casinos, Inc*., 2018 WL 2059547, *3 n9 (Nev. App. 2018). The fact that an airline seat injured plaintiff's foot is not enough to show that defendant breached its duty of care. However, as discussed above, plaintiff has set forth enough evidence for reasonable minds to conclude that defendant may have breached the heightened duty of care owed to her.

conducts weekly checks of its Airbus A320 aircraft, but do not check the mounting of the plane's seats.  These checks are done in accordance with the maintenance protocol set forth by Airbus. A reasonable juror could conclude that had defendant been using the "utmost care and diligence for the safety of the passengers," this defect should had been discovered by defendant during these inspections.  *See Miller v. Greyhound Lines, Inc*., 2020 WL 4586985, *2-3 (D. Nev. 2020) (finding that a question of fact remained as to whether common carrier breached its duty of care when it did not have enhanced safety measures for a bus bathroom emergency exit).

However, viewing the evidence in a light most favorable to defendant, the Court also finds that a reasonable fact finder could conclude that defendant did not breach its duty of care. Defendant has presented testimony that it diligently checks its Airbus A320 planes on a three-day and weekly basis.  Defendant also has presented evidence that it has complied with all FAA regulations and the maintenance manuals for the subject seat and plane.  Defendant also received a certification from an FAA-certified repair station that the plane's seats were installed properly, upon which it reasonably relied.

Defendant maintains that there is no requirement under the FAA or any maintenance manuals for it to "independently and redundantly inspect or otherwise confirm the certified work performed by Lufthansa PR."  The Court rejects this argument.  Defendant has not provided, nor has the Court located, a single case holding that the issuance of an certification from an FAA-certified repair station is an absolute defense to a state law negligence claim.  In fact, case law actually suggests the opposite.  *See U.S. Aviation Underwriters, Inc. v. Pilatus Business Aircraft, LTD*, 2006 WL 2844173, *7 (D. Colorado) ("Defendants' suggestion that FAA certification affords all aircraft and aircraft component part manufacturers a presumption of nonliability for defects that may only later manifest themselves is facile."); *Ferguson v. Trans World Airlines,*

26

*Inc.*, 135 F.Supp.2d 1304, 1311-1312 (N.D. Georgia 2000) ("Despite the defendant's protestations that it did not breach any FAA standard of care, the court finds that a reasonable jury could conclude it was not impossible for the defendant to comply with federal regulations and undertake additional safety measures that necessarily arise under its heightened duty of care.")(internal quotations omitted)  Plaintiff has offered evidence that the seat was not installed correctly.  Ultimately, the responsibility lies with defendant to ensure that the plane is in a airworthy condition.  *See* 14 CFR § 91.403(a) ("The *owner* or operator of an aircraft is primarily responsible for maintaining that aircraft in an airworthy condition, including compliance with Part 39 of this chapter.")(emphasis added)  While defendant's purported compliance with FAA regulations and maintenance protocols is certainly evidence that they did not breach the duty of care, it is not proof of such care.  *Price v. Sinnott*, 85 Nev. 600, 605 (Nevada 1969) ("Neither is proof of compliance with [an administrative regulation] proof of due care as a matter of law, but rather, it is evidence of such care."); *Union Pacific Railroad Co. v. Winecup Ranch, LLC*, 2020 WL 7125918, *21 (D. Nev. 2020).

Moreover, the relevant inquiry is not whether defendant has a specific mandate to conduct inspections of the seat mountings.  Rather, the inquiry is whether defendant's failure to notice that this seat was not installed properly could be considered a breach of its heightened duty of care as a common carrier.  This is a question of fact, not of law.  *See Miller*, 2020 WL 4586985, *2-3; *Lee v. GNLV Corp.*, 22 P.3d 209, 212 (Nev. 2001) ( "[C]ourts are reluctant to grant summary judgment in negligence cases because foreseeability, duty, proximate cause, and reasonableness usually are questions of fact for the jury.") (internal quotation omitted)

Accordingly, because there is a material factual dispute, summary judgment for either

party is not appropriate.[7]  The Court DENIES defendant's Motion for Summary Judgment and

DENIES plaintiff's Motion for Partial Summary Judgment as to Count One.

>   **C.**     **Affirmative Defenses**

Plaintiff also moves for summary judgment on several affirmative defenses pled in

defendant's Answer.[8]  Courts "can and do resolve affirmative defenses at the summary judgment

stage."  *Speedeon Data, LLC v. Integrated Direct Mktg*., LLC, 718 Fed.Appx. 333, 337 (6th Cir.

2017).  The summary judgment standard of review remains the same.  *Resolution Trust Corp. v.*

*Metropole Bldg. Ltd. Partnership*, 1997 WL 160330, *1-2 (6th Cir. 1997) (holding that

defendants against whom a motion for summary judgment is made "must go beyond the

pleadings in the case and provide evidence designating specific facts showing that there is a

genuine issue for trial.")  In a federal diversity action, whether a contention is an affirmative

defense is a question of state law.  *Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895, 901

(6th Cir. 2002).

Plaintiff first moves for summary judgment on defendant's statute of limitations

---

[7]     Plaintiff also argues that the doctrine of *res ipsa loquitor* compels summary
judgment in her favor.  The Court finds no support for this argument.  *Res ipsa
loquitor* "means that the facts of the occurrence warrant the inference of
negligence, not that they compel such an inference."  *Jones v. Las Vegas Valley
Water Dist*, 2014 WL 1248233, *7 (D. Nev. 2014) (quoting *Jesionowski v. Boston
& M. R.R.*, 329 U.S. 452, 457 (1947)).  It is plaintiff's burden to establish the
elements of negligence in order to prevail on a motion for summary judgment and
referencing this doctrine offers no substitution for that burden.  *See Downey v.
Roof Bolt Transport, Inc.*, 2021 WL 232592, *4 (E.D. Ky 2021) ("Plaintiff has
not pointed to any precedent establishing *res ipsa* as a basis for summary
judgment, nor has the Court found any.")

[8]     Defendant has withdrawn the following defenses: (1) comparative/contributory
negligence; (2) assumption of the risk; (3) failure to mitigate; and (4) unrelated,
pre-existing, subsequent conditions.

affirmative defense.

Defendant asserts the following affirmative defense in its Answer:

Statute of limitations/Period of limitations: To the Extent claims were brought
after the expiration of the applicable statute of limitations, period of limitations,
or contractual limitations period, Plaintiffs' claims are barred.

Plaintiff argues that under both Ohio and Nevada law, the statute of limitations for

personal injury actions is two years.  She notes that this action was brought within this two-year

period.

In response, defendant acknowledges that its statute of limitations defense may be

"untenable."  However, defendant argues that plaintiff brought her claim beyond the "governing

contractual limitations period."  In support of this assertion, defendant has attached a "Contract

of Carriage," which provides that passengers must bring legal action against defendant within six

months of an incident.  This document is not authenticated in its present form.  However, it is

capable of being authenticated if the matter is to go to trial and, therefore, may be considered on

a motion for summary judgment.  *Alexander v. Caresource*, 576 F.3d 551, 558 (6th Cir. 2009)

("The submissions by a party opposing a motion for summary judgment need not themselves be

in a form that is admissible at trial."); *Romero v. Nevada Dep't of Corr.*, 673 Fed.Appx. 641, 648

(9th Cir. 2016) (Thomas, C.J., concurring) (noting that summary judgment evidence need only

be "authentic or capable of being authenticated" to be considered).  Accordingly, because

defendant has raised an issue of material fact as to this affirmative defense, plaintiff's Motion for

Partial Summary Judgment with respect to defendant's period of limitations affirmative defense

is denied.

Plaintiff next moves for summary judgment on defendant's affirmative defenses of

superceding/intervening cause and third party fault.  Plaintiff argues that defendant has offered

nothing more than "empty speculation" that a third party is responsible for her injuries.  In response, defendant argues that there is evidence that Lufthansa PR improperly installed the front lug of the subject seat.  Defendant maintains that it may "exercise its right to apportion liability to nonparties" if this matter proceeds to trial.

As an initial matter, defendant is incorrect that it may seek to apportion fault to non-parties at trial.  Under Nevada law, a "jury may not apportion fault to non-parties, and evidence or argumentation directed to showing non-parties' comparative fault is therefore inadmissible." *Phillips v. C.R. Bard, Inc.,* 2015 WL 260873, at *4 (D. Nev. 2015).  *See also Wise v. Swift Transp. Co, Inc*., 2011 WL 866067, *5 (D. Oregon 2011) ("Nevada, however, does not allow apportionment of negligence between nonparties.")  However, Nevada law does not prohibit "a party defendant from attempting to establish that either no negligence occurred or that the entire responsibility for a plaintiff's injuries rests with nonparties."  *Banks ex rel. Banks v. Sunrise Hospitals*, 120 Nev.822, 845 (Nevada 2004).  *See also Phillips*, 2015 WL 260873 at *4.

Therefore, while defendant is prohibited from offering evidence that a non-party is comparatively negligent, it may offer evidence that a non-party is solely responsible for plaintiff's injuries.  *Prado-Guajardo v. Perez*, 2017 WL 3951647, *5 (D. Nev. 2017) ("[Defendant] may argue that [a third party] was entirely at fault and that [defendant] was not at fault at all, and [defendant] may adduce otherwise admissible evidence in support of that argument."); *Union Pacific Railroad Company v. Winecup Ranch, LLC*, 2020 WL 7125918, *9 (D. Nev. 2020).

Viewing the evidence in a light most favorable to defendant, the Court finds that a reasonable juror could conclude that a third party was responsible for plaintiff's injuries.  Lufthansa PR, a non-party, certified that the seats were installed correctly and that the plane was

"airworthy" under FAA standards.  Expert testimony indicates that the seat may not have been installed correctly and when subjected to Sheppard's weight, injured plaintiff.

Plaintiff argues that defendant must establish what duty a third party owed her in order to survive summary judgment on its third party fault defense.  Defendant admittedly does not explain what duty Lufthansa PR, or any other non-party, owes plaintiff.  However, plaintiff cites to no Nevada case law to support the proposition that all elements of a negligence claim must be established by defendant in order for it to present arguments as to third party fault.  Given that neither party has sufficiently developed this argument, the Court declines to decide this issue on summary judgment.

Plaintiff also moves for summary judgment on defendant's federal preemption affirmative defense.  In response, defendant notes that the FAA regulates the airline industry through FARs.  It then confusingly argues that the FARs "exclusively" govern plaintiff's claim "in part."  It also cites an out of circuit district court case which found that the state law standard of care was preempted by the FAA, but also found that state law tort remedies against airlines are not preempted.  *See Levy v. Continental Airlines, Inc*., 2007 WL 2844592 (E.D. PA 2007).

The Court is unclear as to the exact contours of this affirmative defense and it will not speculate.  Plaintiff's claim is based on a state common law standard of care and defendant has agreed that this standard of care applies.  Defendant also has not advanced any arguments that there is no state law remedy available to plaintiff due to federal preemption.  Defendant bears the burden of proof as to whether it is entitled to the benefit of federal preemption.  "Federal preemption is an affirmative defense that requires the defendant on a motion for summary judgment to produce sufficient evidence, considered in the light most favorable to the nonmovant, to prove that there is no genuine issue of material fact as to whether federal

31

preemption applies." *Byrne v. CSX Transp., Inc.,* 541 Fed.Appx. 672, 674-675 (6th Cir. 2013)(citing *Brown v. Earthboard Sports USA, Inc.,* 481 F.3d 901, 913 (6th Cir.2007). Defendant has wholly failed to explain why federal preemption potentially applies to the facts and circumstances of this suit.[9]  Accordingly, the Court will grant this portion of plaintiff's Motion for Partial Summary Judgment.

Finally, plaintiff summarily argues that summary judgment should be granted in her favor on twelve different affirmative defenses raised by defendant.  While the Court questions whether most of these are actually affirmative defenses, i.e. lack of causation, no breach of duty, the Court declines to grant summary judgment and will allow defendant to make these arguments. Accordingly, this portion of plaintiff's Motion for Partial Summary Judgment is denied.

## CONCLUSION

For the foregoing reasons, defendant's Motion to Exclude is GRANTED IN PART and DENIED IN PART.  In addition, the Court DENIES defendant's Motion for Summary Judgment and GRANTS IN PART and DENIES IN PART plaintiff's Motion for Partial Summary Judgment.

IT IS SO ORDERED.

---

[9]    The Court does note that defendant has provided evidence that it has complied with all FAA and FAR inspection requirements and that the seat was compliant with FAA crash loads.  Defendant uses this evidence to support its argument that it did not breach its duty to plaintiff.  Defendant is certainly entitled to pursue such an argument.  However, this is not an affirmative defense.  *See Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) ("A defense which points out a defect in the plaintiff's *prima facie* case is not an affirmative defense."); *Ford Motor Co. v. Transport Indem. Co.*, 795 F.2d 538, 546 (6th Cir. 1986) ("[S]ome defenses negate an element of the plaintiff's *prima facie* case; these defenses are excluded from the definition of affirmative defense.")

32

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 3/30/21            Chief Judge